## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>FRANK G. SCHAFFER D/B/A FGS GEMS,<br>*Debtor* | Case No.  18-18133-AMC<br><br>Chapter 13 |

## ORDER

AND NOW, this _____ day of _____, 2018, upon consideration of Creditors Kichkin General Trading, LLC and Rashiduddin Mohammadi's Expedited Motion for Relief from the Automatic Stay, and any response thereto, it is hereby ORDERED that the Motion is GRANTED.  The Creditors shall be granted full and complete relief from the automatic stay to pursue all otherwise lawful procedures relating to any efforts to collect on their claims and judgments against the Debtor, including without limitation all remedies available under state law in the actions pending in the Philadelphia Court of Common Pleas at 160702575 and 160601668.

BY THE COURT:

_____ _____
ASHELY M. CHAN, U.S.B.J.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>FRANK G. SCHAFFER D/B/A FGS GEMS,<br>*Debtor* | Case No.  18-18133-AMC<br><br>Chapter 13 |

### CREDITORS KICHKIN GENERAL TRADING, LLC'S AND RASHIDUDDIN MOHAMMADI'S EXPEDITED MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Kichkin General Trading, LLC ("Kichkin") and Rashiduddin Mohammadi ("Rashid"), creditors in the above-referenced case, move this Court, on an expedited basis, for an Order for relief from the automatic stay, permitting Kichkin and Rashid to proceed with their state court execution remedies and related state court proceedings.  Debtor Frank G. Schaffer ("Debtor") previously filed a sham bankruptcy and only moved to voluntarily dismiss it to avoid having Kichkin and Rashid securing a ruling from the Court that the prior bankruptcy was in bad faith.  After Kichkin and Rashid were very close to obtaining money and other property held by the Debtor through state court execution remedies, Debtor commenced this bankruptcy, again in bad faith, to thwart Kichkin's and Rashid's lawful execution efforts.  For these reasons, Kichkin and Rashid move for relief from the automatic stay on an expedited basis, and in support thereof, state as follows:

### JURISDICTION

1.     On December 10, 2018, Debtor filed a voluntary petition for relief (the "Petition") under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

3.     This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

4.     This Motion is filed pursuant to 11 U.S.C. § 1109 and 11 U.S.C. § 109(e).

## **FACTS**

5.      Previously, on March 28, 2018, Debtor filed a voluntary petition under Chapter 13 in this Court at Docket No. 18-11955 (the "Prior Bankruptcy").

6.      On August 21, 2018, Kichkin and Rashid moved to dismiss the Prior Bankruptcy due to, *inter alia*, Debtor's demonstrated bad faith.  (A copy of same, without exhibits, is attached as Exhibit "1").

7.      In order to avoid a finding of bad faith, shortly thereafter, Debtor moved to voluntarily dismiss the Prior Bankruptcy.

8.      On September 25, 2018, this Court, in the person of the Hon. Ashely M. Chan, United States Bankruptcy Judge, held a hearing on the Motions to Dismiss.

9.      Ultimately, the Court allowed the Debtor to voluntarily dismiss the Prior Bankruptcy, but warned during the hearing that there was a serious question as to whether Debtor had acted in bad faith, and invited the creditors to file expedited motions to dismiss any future bankruptcy filing.  (*See* transcript of hearing at pp. 24-5, attached hereto as Exhibit "2").

10.     Now, Debtor has come back to this Court for no better reason that he had before, this time filing a Chapter 11 Petition.

11.     In fact, the events which took place since the dismissal of the Prior Bankruptcy make the Debtor's bad faith even starker, as described *infra*.

12.     But first, however, in the interests of creating a complete record and reminding the Court of the bases for the allegations of bad faith in the Prior Bankruptcy, it is appropriate to recount all the pertinent facts.

**I.**      **Events Preceding the Prior Bankruptcy**

13.      In 2013, Kichkin and the Debtor entered into a contract whereby Kichkin would provide certain valuable gems to the Debtor (the "Kichkin Agreement").  Pursuant to the Kichkin Agreement, the Debtor would cut, polish, and sell the gems, then pay Kichkin's expenses, including the cost of acquisition of the gems, and split the profits with Kichkin.

14.      The Debtor made several sales of gems provided by Kichkin, but never made a single payment to Kichkin and never gave any of the gems back to Kichkin, as required by the Kichkin Agreement.

15.      In 2015, Rashid and the Debtor entered into a separate, wholly enforceable agreement (the "Rashid Agreement") whereby the Debtor agreed to pay Rashid, personally, for all the monies Rashid had guaranteed in order to finance Kichkin's and the Debtor's business arrangement under the Kichkin Agreement.

16.      The Debtor also failed to make a single payment to Rashid for monies Rashid personally guaranteed to finance the business arrangement as required by the Rashid Agreement.

17.      Due to the Debtor's defaults under both the Kichkin Agreement and the Rashid Agreement, on July 25, 2016, Kichkin and Rashid filed a lawsuit against the Debtor in the Philadelphia Court of Common Pleas, Commerce Court (the "State Court"), designated Kichkin General Trading, LLC and Rashiduddin Mohammadi v. Frank G. Shaffer, individually and trading as FGS GEMS, July Term 2016, case number 02575 (the "State Court Case").

18.      On February 22, 2018, the State Court entered an Order on a Motion for Summary Judgment in the State Court Case (the "State Court MSJ Order").

19.      The State Court MSJ Order entered a liability judgment on Kichkin's breach of contract claim (Count II of the Complaint) and directed an assessment of damages hearing to

take place within thirty days of the date of the Order ("Kichkin's Claim").  Kichkin was

preparing for the assessment of damages hearing when the Debtor filed his Petition in the Prior

Bankruptcy.

20.    The State Court MSJ Order also granted Rashid summary judgment on his breach

of contract claim (Count III on the Complaint) on both liability and damages, and awarded

Rashid damages in the amount of $561,176.60, "exclusive of interest and costs" ("Rashid's

Claim").

21.    On or about March 5, 2018, Rashid filed an application with the Court in the State

Court Case for costs on the judgment, stating interest and costs incurred in connection with the

lawsuit.[1]

22.    Consequently, less than a month after judgment for damages was awarded and

just prior to the determination of more damages as provided for in the State Court MSJ Order,

Debtor, on March 23, 2018, filed his Chapter 13 Petition in the Prior Bankruptcy.

23.    Notably, on the date he filed his Petition in the Prior Bankruptcy, the Debtor

showed on his website, fgsgems.com, hundreds of thousands of dollars in gems that he owned

and had available for sale.

## II.    Events During the Prior Bankruptcy

24.    On or about April 5, 2018, the Debtor filed his original Chapter 13 Plan (the

"Original 13 Plan") in the Prior Bankruptcy. A copy of the Original Plan is attached hereto as

Exhibit "3."

---

[1] Kichkin and Rashid also each have claims for fraud, promissory estoppel, and unjust enrichment in the State Court Case, which were not disposed of by the State Court MSJ Order, and which were pending when Debtor filed his petition in the Prior Bankruptcy.

25.     The Original Plan inexplicably stated that Kichkin had an allowed secured claim in the amount of $5,000, and the Original Plan made no mention of the amount owed to Rashid.

26.     At the 341 Meeting of Creditors, the Debtor claimed that he had *none* of the gems advertised for sale on his website.[2]

27.     In fact, the Debtor claimed at his 341 Meeting that the gems he lists on his website are complete fictions, designed to deceive the general public so as to drive traffic to his store, and that once a consumer has expressed interest in one of Debtor's non-existent Internet gems, he engages in a classic bait-and-switch by attempting to interest the consumer in another item.

28.     Additionally, at the 341 Meeting of Creditors, the Debtor admitted he was holding valuable gems belonging to Kichkin, but which Debtor refused to return to Kichkin without a release from the State Court judgment and other claims pending against the Debtor in State Court.  The Debtor also admitted at that time that he did not have insurance for those gems.

29.     While Debtor now claims to have insurance for the gems that he is holding that are owned by Kichkin and Rashid, he has failed to provide any proof of such insurance, despite multiple directives from the Trustee in the Prior Bankruptcy.

30.     Following the initial 341 Meeting of Creditors in the Prior Bankruptcy (which the Trustee held open since more information was needed from the Debtor), and only as a result of inquiry by the Trustee, the Debtor belatedly acknowledged that he received $100,000.00 from the estate of his late mother.

31.     On or about June 8, 2018, the Debtor filed an Amended Chapter 13 Plan ("First Amended 13 Plan").

---

[2]The 341 Meeting of Creditors was audio recorded, and a complete copy of the same can be provided upon the Court's request.  Due to the length of the recording, only portions of that audio recording have been transcribed to date, but Kichkin and Rashid can obtain a complete transcript if the Court requires.

32.    Like the Original Plan, the First Amended Plan again stated, without elucidation, that Kichkin had an allowed secured claim in the amount of only $5,000, and made no mention of the amount owed to Rashid.

33.    Subsequently, on June 11, 2018, Kickin and Rashid each filed Proofs of Claim in the Prior Bankruptcy, which are attached hereto as Exhibits "4" and "5" (reflecting Debtor's unsecured debts, including the sum certain reflected in the State Court Order).

34.    On or about June 11, 2018, the Debtor filed an Amended Amended Chapter 13 Plan (the "Second Amended 13 Plan"), which once again, stated that Kichkin had an allowed secured claim in the amount of only $5,000 (again without elucidation) and omitted any reference to the amount owed to Rashid.   At true and correct copy of the Second Amended Plan is attached hereto as Exhibit "6."

35.    Despite the fact that the Debtor lives with his wife and dependent child in Center City Philadelphia, his Bankruptcy Schedules and Statement of Financial Affairs in the Prior Bankruptcy did not include or account for housing expenses and show that Debtor has only $200 per month available after all other expenses are accounted for.

A.    **The August 7ᵗʰ Hearing: Debtor Admits He Spent $100,000 Without Authorization**

36.    At a hearing before this Court in the Prior Bankruptcy on August 7, 2018 (relating to the Trustee's Amended Motion to Dismiss, and Kichkin's and Rashid's support for same), the Trustee asked the Court to inquire about $100,000 that Debtor received from his late mother's estate.

37.    Previously, at the 341 Creditors' Meeting, the Debtor had stated that he was not sure if he would ever receive *any* money from his mothers' estate, due to a lack of information from his late mother's estate.  *See* Partial Transcript of 341 Meeting, attached as Exhibit "7."

38.    Thereafter, the Debtor received $100,000 from his late mothers' estate, and his counsel reported same to the Trustee.

39.    Then, at the August 7th hearing, the Debtor informed the Court for the first time that he had already spent all of the $100,000 estate payment that he received in order to pay other "debts" and so that he could "do business" in Hong Kong.

40.    Noting that Debtor did not have sole discretion to spend that money as he pleased – since he was in a bankruptcy – and after the Trustee argued that the Debtor's case should be dismissed due to his bad faith conduct in spending the $100,000 without authorization or prior notice, the Court requested that the Chapter 13 Trustee amend his Motion to Dismiss (*i.e,* file a second amended motion to dismiss), in order to provide Debtor with due process.

41.    The Court also informed counsel for Kichkin and Rashid that they could file their own motion to dismiss as well.

42.    Accordingly, the Court ordered that it would hear oral argument on any such motions on September 25, 2018.

**B.    Debtor's Reactionary Amended Operating Reports**

43.    Shortly following the August 7th Hearing, the Debtor filed amended monthly operating reports in the Prior Bankruptcy that only further evidenced his bad faith.

44.    Despite Debtor's counsel's assertions at the August 7th Hearing that the Debtor consistently and fully disclosed the extent of Debtor's expenses from month to month, five days *after* the August 7th Hearing, under the guise of being titled only a July 2018 Monthly Operating Report, the Debtor filed *amended* Monthly Operating Reports for March 2018, April 2018, May 2018, and June 2018 (collectively "Amended Operating Reports").  A true and correct copy of

Debtor's August 12, 2018 filing of the Amended Operating Reports is attached hereto as Exhibit "8."

45.    Debtor's amended May 2018 Operating Report shows Debtor's receipt of the $100,000 from his late mother's estate. *See id.*

46.    Notably, Debtor's expenses for the two months before he received the $100,000 (*i.e.,* March 2018 and April 2018) estate payment drastically differ from the total business expenses for two months following the estate payment (*i.e.,* June 2018 and July 2018), as reflected in the following table:

| | | **BUSINESS EXPENSES ($)** | | **BUSINESS EXPENSES ($)** |
|---|---|---|---|---|
| **MONTH 1** | *March 2018* | $20,607.80 | *June 2018* | $44,463.20 |
| **MONTH 2** | *April 2018* | $23,498.49 | *July 2018* | $53,877.35 |
| **MONTH 1 + MONTH 2 TOTAL** | *March 2018 + April 2018* | $44,106.29 | *June 2018 + July 2018* | $98,340.55 |

47.    As shown above, in the two months following the estate payment, Debtor all of a sudden had $54,234.26 more in total business expenses than in the two months prior to receiving the estate payment.

48.    It is also notable that that Debtor, who allegedly "needed" to spend part of the estate payment to do "business" in Hong Kong, had his worst month of actual income from sales and services in July 2018 and even claims he took out a loan for $16,000 from "Horizon." *See id.*

49.    These circumstances strongly suggest that Debtor's purported June and July business expenses were not bona fide expenses needed to maintain the status quo of his business

operations, but rather, a convenient smokescreen for Debtor to claim he has spent the $100,000

he received from his late mother's estate in late May.

50.    Thereafter, Kichkin and Rashid filed their aforementioned Motion to Dismiss the

Prior Bankruptcy due to Debtor's bad faith, ultimately resulting in Debtor voluntarily dismissing

the Prior Bankruptcy, thereby avoiding a formal finding of bad faith.

### III.    Events Following the Prior Bankruptcy

51.    After the Prior Bankruptcy was dismissed, Rashid's counsel sought to execute on

the State Court Judgment.

52.    On November 1, 2018, Rashid obtained a Writ of Execution naming the Debtor's

late mother's estate as a Garnishee in the State Court action.  (The full name of the named

Garnishee is Estate of Mary R. Schaffer, Rita G. Steller, Executrix, Represented by Linda S.

Luther-Veno, Esq.; it is referred to hereafter as the "Estate of Mary R. Schaffer.")  A copy of the

Writ of Execution is attached as Exhibit "9."

53.    That same day, Rashid also filed Interrogatories to Garnishee and served them on

the Estate of Mary R. Schaffer, inquiring as to any monies that had been paid to or were owed to

Debtor by the Estate of Mary R. Schaffer.  A copy of the Interrogatories to Garnishee is attached

as Exhibit "10."

54.    The Estate of Mary R. Schaffer timely responded, and answered that it was

holding, in light of the attachment obtained by Rashid, the sum of **$121,190.85** that would

otherwise be payable to Debtor.  *See* Answers to Interrogatories at No. 6, attached hereato as

Exhibit "11," which were docketed with the State Court on November 27, 2018.

55.    Consistent with the Pennsylvania Rules of Civil Procedure, on December 10,

2018, Rashid filed a Praecipe to Enter Judgment Against Garnishee, so as to facilitate receipt of

the $121,190.85 being held by the Estate of Mary R. Schaffer.  *See* Praecipe to Enter Judgment

attached as Exhibit "12."

56.    *That same day*, *less than one hour after Rashid entered judgment against the*

*Estate of Mary R. Schaffer*, Debtor filed his Chapter 11 Petition in *this* case.  This fact can be

gleaned by examining the timestamp on Exhibit "12" with the docket entry in this matter.

57.    To make matters worse, Debtor's counsel sent an email that night to counsel for

the Estate of Mary R. Schaffer and the undersigned *demanding the immediate disbursement of*

*the $121,190.85 to Debtor*.  A copy of Debtor's counsel's email is attached as Exhibit "13."

58.    The following morning, the undersigned wrote to Debtor's counsel, with copy to

counsel for the Estate of Mary R. Schaffer, stating that the funds in question were attached by

lawful execution process, and while the automatic stay prevented further collection activities by

Rashid, it by no means dissolved the attachment.  Therefore, the correct course of action would

be for the Estate of Mary R. Schaffer to hold the funds until this bankruptcy is resolved – *not* to

pay them to Debtor.  The undersigned further suggested that, to avoid inconvenience to the

Estate of Mary R. Schaffer, the monies could be interpled into this Court.  A copy of the

undersigned's letter is attached as Exhibit "14."

59.    In reply, the Debtor's counsel reiterated his position, going so far as to suggest

that the undersigned's suggestion that the Estate of Mary R. Schaffer continue to hold the funds

subject to a valid, existing attachment somehow violated the automatic stay.  A copy of that reply

is attached as Exhibit "15."

60.    Debtor's intent is obvious:  he is using the bankruptcy process to thwart the valid

use of the judgment execution process by a creditor.

61.    In addition, shortly before the entry of the Judgment Against Garnishee, Kichkin had obtained a Writ of Seizure from the State Court, so as to protect Kichkin's property that the Debtor was admittedly holding from being intermingled with the Debtor's in the Sheriff's levy process (as Rashid also sought in the State Court to have the Sheriff levy upon Debtor's personal property, so as to facilitate an eventual Sheriff's Sale; Kichkin merely wanted to get its property back and avoid the Sheriff accidentally selling Kichkin's property that the Debtor was holding).

62.    A Writ of Seizure is a remedy grounded in replevin, which allows the Sheriff to seize specifically identifiable property that belongs to a plaintiff.

63.    In this case, the issuance of the Writ of Seizure was based upon the Debtor's admission that he was holding property belonging to Kichkin, but refused to return it without a release.  *See* ¶ 28, *supra*, and Motion for Issuance of Writ of Seizure (Replevin) filed with State Court, attached as Exhibit "16."

64.    To protect Kichkin's property interests, the State Court issued the requested Writ of Seizure on November 27, 2018.  *See* Order granting Writ of Seizure, attached as Exhibit "17."

65.    As this Court knows, the Sheriff's Office does not immediately enforce the Court's Orders; the process can take a few weeks or months.  Thus, the Sheriff was unable to serve and execute upon the Writ of Seizure prior to the Debtor's filing of the Chapter 11 Petition in the instant case.

66.    Thus, the Debtor intended, through the filing of the Chapter 11 Petition in the instant case, not only to thwart Rashid's efforts to execute on monies held by a garnishee, but also to prevent Kichkin's retrieval of its own property being held by the Debtor.

67.    The Debtor's filing of the Chapter 11 Petition in the instant case also served yet another means of frustrating Kichkin's and Rashid's lawful use of process in the State Court.

68.    As noted above, Kichkin obtained summary judgment on liability against Debtor in the State Court, but the Prior Bankruptcy prevented Kichkin from having an assessment of damages hearing.

69.    On November 28, 2018 (following the dismissal of the Prior Bankruptcy), so as to determine the amount of damages to award Kichkin against Debtor, the State Court scheduled an assessment of damages hearing for December 10, 2018 – *the same day that Debtor ultimately filed the Petition in the instant case*.  (See Notice of Scheduling, attached as Exhibit "18".)

70.    Although the State Court later postponed the assessment of damages hearing (for unrelated reasons), it is possible and even likely that Debtor's counsel planned to file the Petition in the instant case the same day as the State Court hearing so as to prevent the assessment of further damages against Debtor.

71.    Furthermore, the aforementioned Answers to Interrogatories filed by the Estate of Mary Schaffer alerted Kichkin and Rashid to yet another instance of bad faith by Debtor.

72.    In Answer No. 1a (see Exhibit "11"), the Estate of Mary Schaffer states that Schaffer "received $50,000.00 on 10/4/2017.  This was by agreement of all four heirs in settlement of a Will contest."

73.    This answer belies what the Debtor said at his 341 Creditors' Meeting in the Prior Bankruptcy, which took place in May 2018, in which the Debtor stated that he had not received any money from his late mother's estate, and was not sure if he would ever receive any such funds.  *See* Exhibit "7."

**LEGAL ARGUMENT**

74.    Based on all of the foregoing facts, this Court should grant Kichkin and Rashid complete relief from the automatic stay to proceed with all proceedings in the State Court against Debtor, including execution on the existing judgment, collection of the judgment against Garnishee, execution of the Writ of Seizure, and the assessment of damages hearing, as well as all other related proceedings appropriate under state law.

75.    11 U.S.C. § 362(d), and case law interpreting it, permits the Court to grant relief from the automatic stay where the Debtor behaves in bad faith.  *See In re Myers,* 334 B.R. 136, 142 (E.D.Pa. 2005), *aff'd* 491 F.3d 120 (3rd Cir. 2007);[3] *In re Porter*, 371 B.R. 739, 745 (Bankr.E.D.Pa. 2007) (collecting cases).

76.    When deciding if a filing was in bad faith, a court looks to the "totality of the circumstances," including:

- the timing of the petition;

- the debtor's motive in filing the petition;

- the nature of the debt;

- how the debt arose;

- how the debtor's actions affected creditors;

- the debtor's treatment of creditors both before and after the petition was filed; and

- whether the debtor has been forthcoming with the bankruptcy court and the creditors.

491 F.3d at 125 (citations omitted).

## I.    Timing of the Petition and Motive For Filing

---

[3] Interestingly, Debtor's counsel was also counsel for the debtor in *In re Myers*, in which the court dismissed the debtor's petition for bad faith.

77. The suspicious timing of a bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis. *See In re Myers*, 491 F.3d at 125; *In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000). Moreover, a bankruptcy court may reasonably find that bad faith exists "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose." *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D.Pa.1994); *see also In re Manno*, 2009 WL 236844 at *10 (Bankr. E.D.Pa. 2004) (recognizing bad faith may exist when there are efforts to thwart the trial court as well as impose delay and expense upon the creditor).

78. Here, the circumstances strongly suggest that Debtor timed his bankruptcy to disrupt the State Court Case because:

a.    Debtor filed his Petition *the same day* that Rashid entered judgment against the Estate of Mary R. Schaffer as Garnishee in an effort to collect over $120,000 in satisfaction of Rashid's judgment;

b.    That evening, Debtor's counsel sent correspondence to the Estate of Mary Schaffer's counsel *demanding, in violation of the existing attachment, payment to Debtor of the attached proceeds* being held by the Estate of Mary R. Schaffer, wrongly claiming that the filing of the bankruptcy somehow dissolved the valid execution process of the State Court Case;

c.    Just two weeks prior to Debtor filing his Petition, Kichkin obtained a Writ of Seizure allowing the Sheriff to seize the gems that Debtor admitted belonged to Kichkin, but which Debtor had refused to return;

d.    The State Court was in the process of rescheduling a hearing on damages on the claims for which Kichkin had already secured summary judgment on liability

when Debtor filed his Petition (the Court having initially scheduled the damages hearing

for the same day that Debtor ultimately filed his Petition).

**II.     Nature of the Debt and How it Arose**

79.     This Court should also consider conduct of Debtor with respect to the nature of

the debt and how it arose.

80.     Here, Kichkin's and Rashid's claims were based on breach of contract claims –

which have already been adjudicated in their favor – along with additional pending claims for

fraud and unjust enrichment.

81.     The fact that Rashid's judgment alone for damages, exclusive of interest and

costs, was over a half-million dollars, reflects the extensiveness of Debtor's breach and actions

and is by far the Debtor's largest debt. *See In re* Myers, 491 F.3d at 126 (noting "intention to

avoid a large single debt" is properly a factor in the bad faith inquiry).[4]

**III.    Debtor's Treatment of Creditors Before And After the Petition**

82.     Debtor has never been forthcoming with Kichkin and Rashid at any point during

the litigation in either the State Court Case or the Prior Bankruptcy, and instead has continually

sought to obstruct Kichkin's and Rashid's actions.

83.     As set forth above, at the 341 Meeting of Creditors, the Debtor admitted he was

holding valuable gems belonging to Kichkin, but he refused to return same to Kichkin unless he

received a release from the State Court judgment and other claims pending against the Debtor in

State Court.

---

[4] The Court should also note how Debtor claimed at his 341 Meeting that the gems he lists on his website are complete fictions, designed to deceive the general public so as to drive traffic to his store, and that once a consumer has expressed interest in one of Debtor's non-existent Internet gems, he engages in a classic bait-and-switch by attempting to interest the consumer in another item.

84.   The Debtor also admitted at that time that he did not have insurance for those gems, yet failed throughout the Prior Bankruptcy to provide any proof of such insurance, despite multiple directives from the Trustee.

85.   The Debtor's obstructionist behavior was also reflected in his Second Amended Plan in the Prior Bankruptcy, which showed only $200 left over before housing expenses are even accounted for.

86.   Such a filing was indicative of bad faith for three reasons:  (a) Debtor never could have intended to confirm a Chapter 13 plan with only $200 left over each month before even accounting for housing; (b) Debtor likewise could never confirm a Chapter 11 plan under such financial circumstances; (c) such a filing calls into question how the Debtor will even afford the quarterly Chapter 11 fee to the U.S. Trustee now that he has filed in Chapter 11.

87.   The Debtor's prior statements in his Second Amended Plan in the Prior Bankrutpcy also reek of deception when one considers that the docket in this case reflects that Debtor paid $1,717 to file this Chapter 11 proceeding, and paid his attorney a $15,000 fee to represent him in this proceeding.  It is nearly impossible for Debtor to have been telling the truth in his Second Amended Plain in the Prior Bankruptcy that he had only $200 left over each month before paying for housing, yet less than three months later he has come up with a nearly $17,000 surplus to bring a Chapter 11 case.

88.   Debtor's Petition in the instant case also wrongly characterizes Kichkin as a secured creditor based on agreement alleged entered into by Debtor, when Kichkin is, in fact, an unsecured creditor and no security agreement ever existed.

## IV.   Creditors Have Been Negatively Affected by Debtors' Actions

89.   Debtor's actions have caused significant prejudice to Kichkin and Rashid.

90.    Debtor's most recent Petition thwarted Rashid from collecting over $120,000, which Rashid was on the precipice of receiving, in partial satisfaction of Rashid's valid State Court judgment.

91.    This is after Debtor thwarted Rashid from receiving all or part of $100,000 that Debtor received from the Estate of Mary R. Schaffer during the Prior Bankruptcy.

92.    Debtor's Petition also denied Kichkin the right to have the Sheriff take possession of *Kichkin's own property* that the Debtor admits he is holding.

93.    This delay forces Kichkin and Rashid to continue to unnecessarily incur attorneys' fees, and be deprived of money and other property, all to their ongoing prejudice.

**V.    Debtor Has Not Been Forthcoming with the Court and Creditors**

94.    At the aforementioned August 7th Hearing, this Court observed firsthand Debtor's reluctance to be forthcoming to this Court, at which time he admitted – only after questioning by the Court – that he already spent all of the $100,000 that he received from the Estate of Mary R. Schaffer in order to pay other "debts" and so that he could "do business" in Hong Kong.

95.    The Amended Operating Reports from the Prior Bankruptcy also show drastic alleged increases in business spending and lower sales/services after Debtor received the payment from the Estate of Mary R. Schaffer.

96.    Since the Prior Bankruptcy, the Debtor's mendacity has become more apparent:

a.    the Estate of Mary R. Schaffer revealed that there was an additional $50,000 inheritance the Debtor received, despite claiming at the 341 meeting never to have received any money from the Estate of Mary R. Schaffer.  *See* Exhibits "7" and "11."

b.      Despite claiming in his Second Amended Plan in the Prior Bankruptcy only to have $200 left over each month, even before housing expenses were calculated, the Debtor managed to find nearly $17,000 in less than three months to pay to file this case, suggesting that he has been hiding assets all along.

97.     The aforementioned actions of the Debtor are best characterized by this Court's opinion in *In re Joobeen*, 2007 WL 1521230 at *6 (Bankr.E.D.Pa. 2007), where this Court described similar actions taken by the debtor in that case as follows:

> [B]y picking and choosing who will be paid, [the debtor] thumbs his nose at the bankruptcy law … The oath that he was required to take to assure fairness, honesty and integrity to the proceeding was a mere formality without meaning to him. He views bankruptcy as an entitlement without concomitant responsibility to be used so long as it serves his needs and abandoned when it does not.[5]

98.     Ultimately, the bankruptcy process is designed to serve an economic good, rather than simply being an artifice for debtors to thwart legitimate efforts by their creditors.

99.     Yet, as demonstrated by the above, thwarting Kichkin and Rashid appears to be the only purpose for which this Debtor has filed for bankruptcy protection as he only cares for the rules of bankruptcy when they shield him from and obstruct legitimate efforts by Kichkin and Rashid.

100.    That is not the purpose of bankruptcy.

101.    Furthermore, the filing of a second bankruptcy following a dismissal of a prior bankruptcy, where the second bankruptcy was filed close in time to an action by a creditor to execute on a lawful judgment, has been found itself to support a finding of bad faith.  *See, e.g., In re 234-6 West 22nd St. Corp.*, 214 B.R. 751 (Bankr.S.D.N.Y. 1997); *Matter of Seaspire, Inc.*, 56 B.R. 159 (Bankr.M.D.Fla. 1985).

---

[5] Coincidentally, Debtor's counsel here was also counsel for the debtor in *In re Joobeen*.  The Court can see a pattern emerge here from Debtor's counsel's prior involvement in similar cases in which debtors acted in bad faith.

102.     For all the above reasons, Kichkin and Rashid should be granted complete and total relief from the automatic stay, and be permitted to pursue all otherwise lawful means of execution relating to the State Court Case.

103.     Kichkin and Rashid consent to the entry of a final order or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

WHEREFORE, Kichkin General Trading, LLC and Rashiduddin Mohammadi respectfully request that the Court enter an order granting them relief from the automatic stay, and that this Court grant all such further relief as it deems appropriate under the circumstances.

Respectfully submitted,

Dated: December 21, 2018          By:     /s/ Benjamin A. Andersen
                                                **WISLER PEARLSTINE, LLP**
                                                David M. Burkholder, Esquire
                                                Benjamin A. Andersen, Esquire
                                                460 Norristown Road, Suite 110
                                                Blue Bell, PA 19422
                                                Telephone:  (610) 825-8400
                                                Facsimile:  (610) 828-4887

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| In re:<br>FRANK G. SCHAFFER D/B/A FGS GEMS,<br>*Debtor* | Case No.  18-18133-AMC<br><br>Chapter 13 |
|---|---|

### <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that, on August 21, 2018, I caused a true and correct

copy of the Creditors Kichkin General Trading, LLC's And Rashiduddin Mohammadi's

Expedited Motion For Relief From The Automatic Stay to be served electronically by way of the

Court's CM-ECF filing system on all parties who have entered their appearance in this case.

Dated: December 21, 2018          By:     /s/ Benjamin A. Andersen

**WISLER PEARLSTINE, LLP**
David M. Burkholder, Esquire
Benjamin A. Andersen, Esquire
460 Norristown Road, Suite 110
Blue Bell, PA 19422
Telephone:  (610) 825-8400
Facsimile:  (610) 828-4887

*Attorneys for Kichkin General Trading, LLC and*
*Rashiduddin Mohammadi*