## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | **Chapter 11** |
| | : | |
| **FRANK G. SCHAFFER,** | : | **Bankruptcy No. 18-18133-AMC** |
| | : | |
| **DEBTOR** | : | |

_____:

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

### I.    INTRODUCTION

Kichkin General Trading, LLC ("Kichkin") and Rashiddudin Mohammadi ("Rashid") (collectively "the Movants"), holders of prepetition judgments against the debtor, Frank G. Schaffer ("Debtor"), jointly move under §362(d)(1) for relief from the automatic stay for cause based upon the Debtor's bad faith in filing this case. Based upon, *inter alia*, the Debtor's failure to fully disclose his assets and liabilities in both of his bankruptcy filings, the Debtor's flagrant disregard of the chapter 13 trustee's warning not to spend funds which constituted property of the estate unless the Debtor could repay such funds to his creditors, the multiple inconsistencies in the Debtor's pleadings, and Debtor's inability to reorganize, the Movants have demonstrated that the Debtor filed this case in bad faith. The Court, therefore, will grant relief from the automatic stay to allow: Rashid to pursue his state law rights against certain proceeds that the Debtor is entitled to receive as an inheritance; Kichkin to pursue its state law rights to recover certain gems that it owns that are in the possession of the Debtor; and Movants to resume state court litigation against the Debtor.

### II.    FACTUAL/PROCEDURAL BACKGROUND

On December 26, 2013, the Debtor, a jeweler trading as FGS Gems out of a shop located at 708 Sansom Street, Philadelphia, PA, entered into a "Partnership Agreement" with Kichkin

1

which acted through its representative, Rashid. Ex. D-1. Pursuant to the Partnership Agreement, the Debtor agreed to clean, cut, polish, develop, and sell valuable gems supplied by Kichkin ("the Gems"). *Id.* Kichkin and the Debtor agreed to split any net profits from sales of the Gems and reimburse Kichkin for expenses incurred in acquiring the Gems. *Id.* The Partnership Agreement, which refers to Kichkin as the owner of the Gems, specifically requires the Debtor to return any unsold gems upon Kichkin's request and does not confer any ownership rights in the Gems to Debtor.[1] *Id.* at 1, 3. The Debtor, therefore, did not purchase the Gems and acknowledges that he does not own them.[2] Tr. Jan. 9, 2019 (hereinafter "Jan. 9 Tr.") 101:18-25, 102:17-25, 111:24 – 112:9, 112:18 – 113:19.

Although the Debtor sold one of the Gems for $7,000, the Debtor was unable to sell the remaining Gems which remain in the Debtor's possession and are uninsured. Tr. Jan. 29, 2019 (hereinafter "Jan. 29 Tr.") 19:1-25, 21:20 – 22:8, 22:9 – 23:24; Case No. 18-11955 ECF Doc. ("ECF") 10 SOFA Pt. 3 #6;[3] Mot. for Relief ¶ 14; Ans. to Mot. for Relief ¶ 4.

On February 2, 2015, Rashid and the Debtor executed a one page "Declaration of Commitment," whereby the Debtor promised to sell the Gems and pay the "total amount of money" to Rashid personally ("Declaration"). Ex. D-2. The Declaration states that "[t]he total

---

[1] *Id.* at 1 ("Whereas, the First Party [Kichkin] owns Gems…and wish [sic] to enter in a partnership with the Second Party [Debtor] in order to develop this [sic] stones and grant the Second Party the right to develop, display, demonstrate and sell these precious stones."), *Id.* at 3 ("[n]et profits shall mean the balance of the proceeds of the operations conducted under this agreement less the cost incurred by the First Party [Kichkin] owner of the Rough Stones.").

[2] Although Debtor's counsel argued on many occasions, without citing any legal basis or analysis, that the Debtor's possession of the Gems confers ownership upon him, the Debtor has repeatedly and consistently testified that he asserts no ownership interest in the Gems. Jan. 9 Tr. 101:18-25, 102:17-25, 111:24 – 112:9, 112:18 – 113:19; Tr. Jan. 29, 2019 14:21 – 17:25.

[3] The Court may take judicial notice of the dockets and content of the documents filed in the Debtor's bankruptcy cases for the purpose of ascertaining timing and status of events in the case and facts not reasonably in dispute. *In re Olick,* 517 B.R. 549, 554, n. 7 (Bankr. E.D. Pa. 2014).

cost of both Emerald and Tourmaline Gems…is US$ 561,176.60." *Id.* It does not appear that the Debtor ever made a payment to Rashid on account of the Declaration.

On July 25, 2016, the Movants filed a lawsuit against the Debtor in the Philadelphia County Court of Common Pleas ("State Court") alleging breach of contract, fraud, promissory estoppel, and unjust enrichment ("State Court Action").[4] Mot. for Relief ¶¶ 17, 19, 20, 21 n. 1. On February 21, 2018, after the Debtor's attorney in the State Court Action failed to respond to the Movants' motion for partial summary judgment, the State Court (1) entered a liability judgment on Kichkin's breach of contract claim ("Kichkin Judgment"); (2) directed that an assessment of damages hearing take place within 30 days of the order; and (3) granted partial summary judgment in favor of Rashid on his breach of contract claim for both liability and damages in the amount of $561,176.60 exclusive of interest and costs ("Rashid Judgment") (collectively "the Judgments"). Jan. 29 Tr. 30:19-22; Ex. R-4, R-5. The Debtor did not file an appeal of the Judgments. On March 5, 2018, Rashid filed an application for costs on the Rashid Judgment in State Court. Mot. for Relief ¶ 21.

During the pendency of the State Court Action, the Debtor's mother, Mary Schaffer, passed away and the Debtor was appointed as executor of his mother's estate ("Estate"). Jan. 9 Tr. 33:25 – 34:11. On October 4, 2017, the Estate paid the Debtor, through his attorney, $50,000 to relinquish his position as executor of the Estate in favor of his sister, Rita Stellar. Ex. R-11 ¶¶1(a), 12 ("…in consideration of the settlement, Frank G. Schaffer would get an additional $50,000 paid from the estate…"); Jan. 9 Tr. 36:21-23. The Debtor's attorney was paid $10,000 for his services and the remaining $40,000 was paid to the Debtor. Jan. 9 Tr. 36:24-37:1.

---

[4] The State Court Action is captioned Kichkin General Trading, LLC and Rashid Mohammadi v. Frank G. Schaffer, individually and trading as FGS Gems, July 2016 Term, Case No. 02575.

One month after the Judgments were entered, the Debtor filed a voluntary petition under chapter 13, on March 23, 2018. Case No. 18-11955 ECF 1. On April 5, 2018, the Debtor filed his schedules, Statement of Financial Affairs ("SOFA"), and chapter 13 plan ("Plan"). *Id.* at ECF 8, 10. There were a number of discrepancies in these filings.

First, the Debtor failed to disclose his interest in the Estate in Schedule B. *Id.* at ECF 10 Sch. A/B Pt. 4 #32. Second, the Debtor failed to disclose on his SOFA that he had received $40,000 from the Estate to relinquish his executorship over the Estate. *Id.* at SOFA Pt. 2 #5. Third, Schedule D identified Kichkin and Rashid as secured creditors holding a single joint claim related to Rashid's Judgment, which the Debtor alleged was only secured to the extent of the Debtor's estimated value of the Gems of $5,000. *Id.* at Sch. D. Finally, the Plan proposed to pay the chapter 13 trustee ("Trustee") $200 per month for 36 months and only proposed to pay the Movants a total of $5,000 under the Plan. *Id.* at ECF 8 Plan Pt. 2, 4(b)(5).

In addition, the only other creditors identified in the schedules are (1) Roberto Pupo, the Debtor's landlord, with an unsecured, unliquidated claim of $30,000 and (2) Dr. Rick Hellman, who has an unsecured, unliquidated claim in the amount of $100,000. *Id.* at ECF 10 Sch E/F Pt. 2 #4.1, #4.2. The Debtor listed his gross income as $2,500 on Schedule I and his net monthly income as $207.[5] *Id.* at Sch. I Pt. 2 #4, Sch. J Pt. 2 #23(c). The Debtor stated in his SOFA that his gross income from January 1, 2018 to March 23, 2018 was $7,500 and that his gross income during each of the past two years was $30,000 per year. *Id.* at SOFA Pt. 2 #4.

In the Debtor's monthly operating report for March 2018, the Debtor stated that he had earned gross income of $11,250.50 from sales and services that month and paid business

---

[5] Because the Debtor resides on the same premises as his store, he reported his rent as a business expense in his monthly operating reports rather than on his Schedules. Jan. 9 Tr. 73:1-8; Ans. Mot. for Relief ¶ 10; Case No. ECF 59 p. 2-6 line 5.

4

expenses of $20,607.80, resulting in a net loss of $9,357.30. *Id.* at ECF 59 p. 6 lines 4, 16, 21.

When taking into account personal expenses and the chapter 13 plan payment, the Debtor

sustained a loss of $10,357.30 in March 2018. *Id.* at line 35.

The April 2018 operating report[6] similarly reflected that the Debtor had earned gross income

of $10,138.00 and paid business expenses of $23,498.49, resulting in a net loss of $13,360.49. *Id.*

at p. 5 lines 4, 16, 21, When accounting for personal expenses and the chapter 13 plan payment,

the Debtor sustained a loss of $14,360.49 in April 2018. *Id.* at 35. Notably, the $21,388.50 in

total gross income earned in March and April was entirely inconsistent with the Debtor's SOFA,

which reported that his monthly gross income was $2,500 and his gross income for the past two

years was $30,000 per year. *See id.* at ECF 10 SOFA Pt. 2 #4, Sch. I Pt. 2 #4.

On May 21, 2018, the Estate sent a check in the amount of $100,000 to the Debtor

("Distribution"). Ex. R-11 ¶ 1(b). On May 24, 2018, the 341 Meeting of Creditors was held

("341 Meeting"). Case No. 18-11955 ECF 25. At that meeting, when asked by the Trustee if he

had any interest in property due to him from someone who had died, the Debtor disclosed his

interest in the Estate for the first time but represented that he did not know whether he would

receive any distribution or whether the Estate had any funds. Jan. 9 Tr. 33:9 – 34:11.

Accordingly, the Trustee continued the 341 Meeting. Case No. 18-11955 ECF 25. The Trustee

subsequently filed a motion to dismiss based upon the Debtor's failure to provide proof of

insurance coverage for current business inventory and the Debtor's ineligibility for chapter 13.

*Id.* at ECF 26.

---

[6] In the April, May and June monthly operating reports, the Debtor initially failed to carry forward the prior month's balance. *See* Case No. 18-11955 ECF 18, 22, 40, 48. The Debtor subsequently remedied this error by filing amended reports for those months. *See* at ECF 59. For purposes of this Opinion, however, the Court is only focused on the Debtor's monthly net gain or loss for each month without consideration of the prior month's carry forward gain or loss.

On or before May 25, 2018, the Debtor received his Distribution from the Estate. Jan. 9 Tr.

41:23-25; Jan. 29 Tr. 37:4-7; Case No. 18-18133 ECF 47 Ex. to Debtor's Reply to Letter Brief.

Upon receipt, the Debtor notified his counsel. Jan. 9 Tr. 41:23 – 42:3; Jan. 29 Tr. 37:6-10. On

May 29, 2018, Debtor's counsel emailed the Trustee advising that the Debtor had received a

substantial payment from the Estate. *See* Ex. D-4. On June 1, 2018, the Debtor amended

Schedule B to reflect the Distribution. Case No. 18-11955 ECF 29, 31. The same day, counsel

for the Debtor received a letter from the Trustee ("Trustee's Letter") stating that "it is clear under

11 U.S.C. Section 541(a)(5), that any interest in property received by 'bequest, devise, or

inheritance' within 180 days of filing is bankruptcy estate property." Ex. D-4. The Trustee's

Letter further noted that

> [s]ince the funds are bankruptcy estate property, any confirmable plan will need to
> comply with 11 U.S.C. Section 1325(a)(4). In other words, if the money is spent, it will
> still have to be accounted for in the plan, and that may well be impossible, depending
> upon the allowed claims and debtor's other resources. It may also call into question
> debtor's good faith. *Id.*

Subsequently, the Debtor filed his May 2018 operating report which reflected the

Distribution and that the Debtor had gross business income of $11,975. Case No. 18-11955 ECF

59 p. 4 lines 1, 2. After paying business expenses of $16,621.02, his personal expenses and the

chapter 13 plan payment, the Debtor reported a total gain of $94,422.01 in May 2018.[7] *Id.* at

lines 16, 35. Absent the Distribution, the Debtor would have suffered a loss of $5,577.99 in May

2018.

The Debtor's June 2018 report reflected that the Debtor had generated gross income of

$10,584.99 and paid business expenses of $44,463.20. *Id.* at p. 3 lines 4, 16. After paying

---

[7] Although the Debtor included his $200 chapter 13 payment on line 34 of the report, he failed to actually deduct
such amount from his net excess income on line 35 of the report so the total net excess income for May 2018 should
have been listed as $94,222.01.

personal expenses and the chapter 13 plan payment and without considering the prior month's

balance attributable to the Distribution, the Debtor sustained a loss of $35,103.21 in June 2018.

*Id.* at line 35.

The Debtor's July 2018 operating report reflected gross business income of $4,265.69 and a

loan from one of the Debtor's cutting customers, Horizon, in the amount of $16,000 ("Horizon

Loan"). *Id.* at p. 2 lines 1, 2. The Debtor paid business expenses of $53,877.35 that month. *Id.* at

line 16. After paying personal expenses and the chapter 13 plan payment and without

considering the Horizon Loan or the prior month's balance attributable to the Distribution, the

Debtor sustained a loss of $50,811.66 in July 2018.

On August 7, 2018, at the hearing on the Trustee's motion to dismiss, the Debtor revealed

for the first time that he had spent the entire Distribution. Mot. for Relief ¶ 39; Sept. 25, 2018 Tr.

15:14-19; Jan. 9 Tr. 41:9-14, 43:12-14; Jan. 29 Tr. 38:15-24, 69:4-22. Specifically, he stated that

he had spent the Distribution to (1) catch up on roughly $18,000 of postpetition rent; (2) attend a

trade show in Hong Kong to exhibit gems, which cost the Debtor approximately $22,000-

$25,000 but only resulted in $6,000 in sales; (3) catch up on two months of postpetition health

insurance premium payments amounting to roughly $7,000; (4) pay postpetition amounts totaling

$7,000 owed to employees; (5) pay postpetition bills incurred in casting and model making; and

(6) pay postpetition operating expenses for his business. Jan. 9 Tr. 42:7 – 45:21; Jan. 29 Tr.

38:15- 39:1.

Upon discovering that the Debtor had spent the entire Distribution in flagrant disregard of the

Trustee's Letter, the Court raised the Debtor's good faith with the parties and discussed whether

it would be appropriate for the Trustee and Movants to file motions seeking dismissal based on

the Debtor's unauthorized use of estate property. Mot. for Relief ¶¶ 40-42. On August 21, 2018,

7

the Movants filed a motion to dismiss the Debtor's case as a bad faith filing. Case No. 18-11955 ECF 63.

Meanwhile, the Debtor's August 2018 operating report reflected gross business income of $28,152.00. *Id.* at ECF 66 line 1. The Debtor paid business expenses of $31,182.74 that month. *Id.* at line 16. After paying personal expenses and the chapter 13 plan payment and without considering the prior month's balance attributable to the Distribution or the Horizon Loan, the Debtor sustained a loss of $4,580.74 in August 2018.

On September 17, 2018, the Debtor amended his Plan ("Amended Plan") to reflect that he would pay an additional $100,000 to the Trustee by December 31, 2019 without explaining how he would do so. *Id.* at ECF 69 Plan Pt. 2(a)(2). However, the next day, on September 18, 2018, the Debtor filed a motion to voluntarily dismiss his chapter 13 case. *Id.* at ECF 70. On September 25, 2018, the Court granted the Debtor's motion to voluntarily dismiss his case. *Id.* at ECF 75.

On October 9, 2018, Rashid obtained a writ of execution on the Rashid Judgment to levy upon the Debtor's personal property located at the FGS Gems shop for an eventual sheriff's sale. Ex. R-17 p. 4. On November 1, 2018, Rashid obtained and served a writ of execution naming the Estate as a garnishee in the State Court Action and filed and served interrogatories upon its counsel inquiring about monies that had been paid or were owed to the Debtor. Ex. R-9, R-10. Counsel for the Estate responded that the Estate was holding the sum of $121,190.85 ("Second Distribution") which was payable to the Debtor.[8] Ex. R-11 ¶¶ 1(c), 6. Through the interrogatory responses, the

---

[8] Under Pennsylvania law, service of a writ of execution upon a garnishee immediately attaches the property of the judgment debtor that is in the hands of the garnishee. *In re R.H.R. Mechanical Contractors, Inc.,* 358 B.R. 202, 210 (Bankr. E.D. Pa. 2006). As a result, "[a] judicial lien is created on such property of the judgment debtor. That lien arises as of and is perfected on the date on which the writ of execution is properly served upon the garnishee holding the property." *Id.* Accordingly, upon service of a writ of execution, the creditor establishes a security interest in property of the debtor which is in the possession of a third party. *Syzmanski v. Wachovia Bank, N.A. (In re Syzmanski),* 413 B.R. 232, 244-45 (Bankr. E.D. Pa. 2009). Therefore, having properly served counsel for the Estate with the writ of execution, Rashid obtained a lien on the Second Distribution, making Rashid's claim secured to the extent of the value of the Second Distribution.

8

Movants also learned about the $40,000 prepetition payment that the Debtor had received from the Estate to relinquish his executorship. *See id.* at ¶¶ 1(a), 12.

On November 27, 2018, the State Court issued a writ of seizure in Kichkin's favor in order to allow the sheriff to seize the Gems belonging to Kichkin from the FGS Gems store to ensure that the property was not accidentally sold in Rashid's sheriff's sale of the Debtor's personal property.[9] Ex. R-17. On November 28, 2018, the State Court scheduled an assessment of damages hearing for December 10, 2018 to determine the amount of damages to award Kichkin on account of its breach of contract claim.[10] Mot. for Relief ¶ 69; Ex. R-18.

On December 10, 2018, Rashid filed a praecipe to enter judgment against the Estate in order to obtain the Second Distribution.[11] Ex. R-12. On the same day, the Debtor filed the instant chapter 11 case after borrowing at least $7,000 from a cutting customer to pay the $1,700 filing fee and part of his counsel's $15,000 retainer fee. *Compare* Ex. R-12 *with* Case No. 18-18133 ECF 1; Jan. 9 Tr. 78:19 – 79:17. As of the petition date, the sheriff had not yet served Kichkin's writ of seizure. Mot. for Relief ¶ 65. Later that night, Debtor's counsel emailed counsel for the Estate and for the Movants requesting immediate disbursement of the Second Distribution to the Debtor. Ex R-13. Counsel for the Movants objected and the Estate retained possession of the Second Distribution. Ex. R-14, Jan. 9 Tr. 107:19-23.

At the outset of the chapter 11 case, the Debtor filed a motion to extend the automatic stay as well as his schedules and SOFA. Case No. 18-18133 ECF 1, 7. In Schedule D, the Debtor identified Kichkin as a secured creditor with a total claim of $2,451,406.80, but only secured to the extent of the value of the Gems (apparently still worth only $5,000 according to the Debtor)

---

[9] Although the Debtor did not file a response to Kichkin's motion to issue writ of seizure, he attended the hearing on the motion. Jan. 9 Tr. 26:13-23.
[10] The hearing was postponed for reasons unrelated to this proceeding. Mot. for Relief ¶ 70.
[11] The Debtor was aware of Rashid's efforts to collect the Second Distribution. Jan. 9 Tr. 76:22 – 77:4

9

and the Second Distribution. *Id.* at ECF 1 Sch. D. Pt. 1 #2.1. The Debtor also listed Rashid as a secured creditor in Schedule D with a total claim of $1,254,374.86, but only secured to the extent of the value of the Gems and the Second Distribution.[12] *Id.* at Sch. D Pt. 1 #2.2. The only other creditors identified in the schedules are (1) Roberto Pupo, the Debtor's landlord, with an unsecured, unliquidated claim of $30,000 and (2) Dr. Rick Hellman, with an unsecured, unliquidated claim in the amount of $100,000.[13] *Id.* at Sch E/F Pt. 2 #4.1, #4.2. The Debtor failed to list the Horizon Loan and the loan that he obtained to pay the chapter 11 filing fee on Schedule F.

In the SOFA, the Debtor reports that his gross income from January 1, 2018 to December 10, 2018 was $7,500 and that his gross income for the last two years was $30,000 per year. *Id.* at SOFA Pt. 2 #4. The Debtor again failed to list the $40,000 that he received from the Estate nor did he disclose the Distribution on his SOFA. *Id.* at Pt. 2 #5.

On December 21, 2018, the Movants filed an emergency motion for relief from the automatic stay ("Stay Relief Motion") to proceed with their State Court execution remedies and resume the State Court Action so that the State Court may assess Kichkin's damages on its breach of contract claim and resolve the remaining fraud, promissory estoppel, and unjust enrichment claims against the Debtor. *Id.* at ECF 14. A hearing was held on the Stay Relief Motion on January 9, 2019. *Id.* at ECF 26.

---

[12] Neither of the Judgments is secured by the Gems because there is no real dispute about the fact that Kichkin owns the Gems. As a result, Kichkin contends that it has an unsecured claim. Movants' Letter Brief 10. Despite the Debtor's characterization of the claim in Schedule D, the Debtor does not now seriously seem to contest that Kichkin is unsecured. Debtor's Reply to Letter Brief 2-3.

[13] These amounts are inexplicably identical to the amounts listed in the Debtor's first bankruptcy filing. Dr. Hellman did not appear in the Debtor's chapter 13 case and only recently filed a proof of claim in the chapter 11 case. Case No. 18-18133 ECF 54. Mr. Pupo initially filed, and later withdrew, an emergency motion for relief from the automatic stay in this case and has recently refiled the motion for relief from the automatic stay. *Id.* at ECF 27, 31, 51.

At the hearing, the Debtor stated that, in 35 years, he had never seen such a poor Christmas season for the jewelry industry as in the past year. Jan. 9 Tr. 51:1-4. With 700 jewelry stores closing in 2018, it had been more of a struggle than ever for him to stay in business. *Id.* at 51:11-15. Nevertheless, the Debtor anticipates that his reorganization will succeed because he (1) recently obtained a few new cutting jobs; (2) established a partnership with an operational mine in Kenya granting him 100% sole cutting rights for the mine; (3) is developing a virtual storefront; (4) made contacts on his trip to Hong Kong with new suppliers who can provide him with rough materials to sell; and (5) will relocate in April or May to reduce his monthly rent of $6,750. Jan. 9 Tr. 62:2-11, 73:1-8, 83:8-22, 88:3 – 89:24; Jan. 29 Tr. 59:25 – 60:7.

However, he admitted that he has not yet generated consistent, meaningful additional revenue from these sources. Jan. 9 Tr. 89:25 – 90:18. The Debtor also confirmed that he has refused to return the remaining Gems to Kichkin without receiving a release from the Judgments and other pending State Court claims. Ans. to Mot. for Relief ¶ 5; Jan. 9 Tr. 78:3-13. When asked about the Distribution in his earlier case, he stated that he had spent the entire Distribution in approximately one month. Jan. 9 Tr. 43:12-14. While he claimed that he had intended to pay back the Distribution to his prepetition creditors over the life of the chapter 13 Plan, he had no idea how he would have done so. *Id.* at 49:3-13, 53:4 – 54:7, 82:1-7. He further represented that as of the 341 Meeting, despite previously serving as executor of his mother's Estate, he had no idea whether the Estate would have any funds to distribute. *Id.* at 40:1-5.

The Court raised several concerns that it had about the Debtor's monthly operating reports from the Debtor's first bankruptcy case and the significant losses sustained each month throughout the entire proceeding. *Id.* at 60:25-62:12. The Court asked the Debtor how he had paid for the significant business expenses that were incurred in March and April 2018. *Id.* at

70:19 – 72:12. The Court also questioned the disparity between the gross income reported on the

SOFA in both of the Debtor's bankruptcies and the gross income listed in the Debtor's monthly

operating reports during his chapter 13 case. *Id.* at 116:10-16. The Debtor was unable to provide

explanations for any of these issues. As a result, the Court continued the hearing to January 29,

2019 in order to give the Debtor an opportunity to review the underlying documents and address

the Court's concerns. *Id.* at 118:10-16.

On January 29, 2019, the Court resumed the hearing on the Stay Relief Motion. Case No. 18-

18133 ECF 35, 36. The Debtor presented the Court with (1) his 2017 tax return showing that his

business had experienced an overall net loss that year of over $185,000 and (2) a proposed

amended set of monthly operating reports for March 2018 – August 2018 (collectively, the

"Revised Reports").[14] Ex. D-7; Ex. D-9; Jan. 29 Tr. 55:6-11. Although the Debtor's counsel

stated that the Debtor had brought supporting receipts and documentation for the Revised

Reports, Debtor's counsel did not use them at the hearing and did not seek to have them admitted

into evidence. Jan. 29 Tr. 55:6-15, 56:7-24.

The revised March 2018 report changed the monthly net loss of $10,357.30 to a monthly net

gain of $492.82.[15] *Compare* ECF 59 p. 6 *with* Ex. D-7 p. 1. The revised April 2018 report

changed the monthly net loss of $14,360.49 to a monthly net loss of $804.61. *Compare* ECF 59

p. 5 *with* Ex. D-7 p. 2. Without the Distribution, the revised May 2018 report changed the

monthly net loss of $5,577.99 to a monthly net loss of $4,607.06. *Compare* ECF 59 p. 4 *with* Ex.

D-7 p. 3.

---

[14] The Debtor never filed the Revised Reports nor did he attach a certificate attesting to their accuracy.

[15] The Debtor testified that he had reported a loss for March 2018 because he had initially missed some cash sales from gem cutting, reported his bills rather than actual expenditures, and had not accounted for $363.60 left over from the previous month. *Compare* Ex. D-7 *with* D-8; Jan. 29 Tr. 63:20-25, 64:14-24.

Without the Distribution, the revised June 2018 report changed the monthly net loss of $35,103.21 to a monthly net loss of $31,083.21. *Compare* ECF 59 p. 3 *with* Ex. D-7 p. 4. Without the Distribution or the Horizon Loan, the revised July 2018 report changed the monthly net loss of $50,811.66 to a monthly net loss of $48,181.66. *Compare* ECF 59 p. 2 *with* Ex. D-7 p. 5. Finally, without the Distribution or the Horizon Loan, the revised August 2018 report changed the monthly net loss of $4,580.74 to monthly net loss of $868.50. *Compare* ECF 66 *with* Ex. D-7 p. 6. In the absence of the Distribution and the Horizon Loan, therefore, the Revised Reports continued to reflect significant losses sustained by the Debtor during his chapter 13 case. In fact, the Debtor sustained a total loss of $85,052.22 during his chapter 13 case pursuant to the Revised Reports, as compared to a total loss of $120,791.39 as reflected in the Debtor's original monthly reports.[16] The main difference between the reports is that the Debtor essentially wiped out his business losses in the first two months of his chapter 13 case.

Although the Debtor claimed that he had receipts to back up the $35,000 decrease in losses reflected in the Revised Reports, the Debtor did not give testimony about any of the receipts, nor were they admitted into evidence. And while the Revised Reports were admitted into evidence, the Court does not give them much weight, in the absence of such receipts, given the unsubstantiated reduction in losses. In fact, the Revised Reports appear to be merely self-serving documents.

Despite the Debtor's testimony that he had secured some lucrative new jobs in the last few weeks, his testimony was inconsistent and unpersuasive. *Compare* Jan. 29 Tr. 58:15-16, 59:3-11 *with* 66:14-21, 95:22 – 96:18. The Debtor stated that he was planning on using the Second

---

[16] In addition, the Debtor previously had testified that he had spent the entire Distribution by August 7, 2018 but the Revised Reports conflict with such testimony. Sept. 25, 2018 Tr. 15:14-19; Jan. 9 Tr. 43:12-14; Jan. 29 Tr. 69:4-24; *See* Ex. D-7 p. 5-6 line 35.

Distribution to fund his chapter 11 plan and that he would not replace the Distribution that he

had spent during his chapter 13 case to pay his creditors in this proceeding. Jan. 29 Tr. 45:2-4,

45:20 – 46:14, 55:21 – 56:2, 98:22 – 99:1, 102:5-13. After the hearing, the Court set a schedule

for post-hearing briefing. Case No. 18-18133 ECF 36, 49.

In the meantime, the Debtor filed his initial monthly operating report for the period of

December 10, 2018-December 31, 2018. *Id.* at ECF 40. As of December 10, 2018, he only had

$1,565.55 in cash on hand. *Id.* at 2. The Debtor had receipts of $9,742.22 which were offset by

disbursements totaling $13,478.19 for this period. *Id.* The Debtor, therefore, sustained a loss of

$2,170.42. In total disregard of this relatively simple mathematical calculation and without any

explanation, however, the Debtor reports that he had a gain of $9,061.67 during this period. *Id.* It

appears that the Debtor realized that the December ending balance on this report had to equal his

reconciled bank statement (which reflected a balance of $9,061.67) so he simply listed the

balance from his bank statement without any explanation of the $11,232.09 discrepancy. In

addition, the bank statement reflects that $20,085.00 was deposited into the Debtor's account but

such amount is not reflected on the report at all. *Id.* at 2, 5. The report also included business

projections for 2019 reflecting that the Debtor anticipates having a profit of only $1,500.00 on

hand at the end of each month. *Id.* at 8.

On February 19, 2019, the Debtor filed his January operating report which reflected receipts

of $7,662.98 and disbursements of $16,440.35. *Id.* at ECF 45 at 2. The Debtor, therefore,

suffered a loss of $8,777.37. He reports, however, that he had a $284.30 gain for the month

based upon the unsubstantiated and illusory gain of $9,061.67 from the prior month which he

carried forward on this month's report. *Id.* Even with these errors, the Debtor's reported net cash

flow of $284.30 for January still cannot be reconciled with his ending bank balance of $1,294.80

and, once again, the Debtor provides no explanation for this discrepancy. *Id.* at 2, 8. Finally, it does not appear that the Debtor paid his rent in January. *Id.* at 2.

## III.   DISCUSSION

In their post-hearing briefs, Movants raise numerous instances of Debtor's bad faith including, *inter alia,* the Debtor's decision to spend the entire Distribution during the Debtor's chapter 13 case and the numerous discrepancies in the Debtor's filings during both bankruptcies. Based upon the Debtor's bad faith, Movants argue that relief from the automatic stay should be granted to: (1) Rashid to pursue his state law rights against the Second Distribution; (2) Kichkin, as the owner of the Gems, to recover such property under state law; and (3) Movants to resume the State Court Action. The Debtor argues that he has not acted in bad faith and that he should be permitted to use the Second Distribution to fund his chapter 11 plan.[17]

The Court finds that the Debtor has triggered almost all of the factors used to determine whether a debtor has filed a bankruptcy in bath faith and that there were numerous unexplained discrepancies and inconsistencies in the Debtor's pleadings. The Court also finds that the Debtor acted in bad faith when he, *inter alia*, spent the entire Distribution in direct contravention of the Trustee's Letter and without any means of repaying such amount to his creditors in the chapter 13 case. Accordingly, cause exists to lift the automatic stay so that Rashid may pursue his state law rights against the Second Distribution; Kichkin may recover its Gems under state law; and Rashid and Kichkin may resume, and liquidate, their claims against the Debtor in the State Court

---

[17] The Debtor's letter brief avers that the Judgments could be avoided pursuant to §522(f)(1)(A) without elaborating further. However, the Debtor has not filed a motion to avoid liens and has failed to present evidence or meaningful argument regarding the merits of such avoidance at either hearing. *See Mahmud v. JTH Inv. Group, LLC (In re Mahmud),* Bankr. No. 08–10855bf, Adv. No. 08–0175, 2008 WL 8099115, at *4 (Bankr. E.D. Pa. Dec. 4, 2008) (debtor seeking to avoid a judicial lien under §522(f) bears the burden of proof). Even if the Debtor had filed a motion to avoid the Judgments under §522(f), however, the Movants would still be entitled to relief from the automatic stay if the Debtor filed this case in bad faith.

but may not execute on any judgment entered in State Court without further relief from this

Court.

### A.  Relief from the Automatic Stay for Cause Pursuant to §362(d)(1)

The filing of a bankruptcy petition operates as an automatic stay of all collection

activities and is one of the fundamental protections afforded to a debtor in bankruptcy. 11 U.S.C.

§ 362(a)(1)-(8); *Vu v. Lin (In re Vu),* 591 B.R. 596, 602-03 (Bankr. E.D. Pa. 2018). However, the

automatic stay is not absolute, and in appropriate circumstances, relief may be granted. *In re*

*SCO Group, Inc.,* 395 B.R. 852, 856 (Bankr. D. Del. 2007). Pursuant to §362(d)(1),

> On request of a party in interest and after notice and a hearing, the court shall grant relief
> from the stay… such as by terminating, annulling, modifying, or conditioning such stay--
> (1) for cause, including the lack of adequate protection of an interest in property of such
> party in interest.

"Cause," which the Bankruptcy Code does not define, is an intentionally broad and flexible

concept which must be determined on a case-by-case basis. *In re Merchant,* 256 B.R. 572, 576

(Bankr. W.D. Pa. 2000). While lack of adequate protection of an interest in property of the

moving party is one cause for relief, it is not the only cause. *In re Porter,* 371 B.R. 739, 745

(Bankr. E.D. Pa. 2007); *see In re Merchant,* 256 B.R. at 576-77. "Cause" may exist to terminate

the stay under §362(d)(1) even if adequate protection is provided. *In re Porter,* 371 B.R. at 745.

Initially, the moving party bears the burden of establishing cause justifying relief from

the stay. *In re Dupell,* 235 B.R. 783, 788 (Bankr. E.D. Pa. 1999).  If the moving party meets this

burden, the burden then shifts to the debtor to establish the absence of cause. *Id.* at 789.

Ultimately, whether cause exists to terminate the automatic stay under §362(d)(1) is committed

to the sound discretion of the bankruptcy court and is determined by examining the totality of the

circumstances. *In re Porter,* 371 B.R. at 744.

Typically, unsecured creditors are only entitled to relief from the automatic stay in rare circumstances. *In re Chan,* 355 B.R. 494, 499 (Bankr. E.D. Pa. 2006); *In re Brown,* 311 B.R. 409, 413 (E.D. Pa. 2004) (unsecured creditors are generally entitled to relief from the automatic stay only in extraordinary circumstances). When an unsecured creditor seeks to lift the automatic stay in order to continue litigation in another forum, however, courts engage in a balancing test allowing for modification of the stay where no great prejudice to either the debtor or the estate would result and where the hardship to the plaintiff caused by the continuance of the stay outweighs the hardship to the debtor caused by the stay modification.[18] *In re Chan,* 355 B.R. at 498; *In re Glunk,* 342 B.R. 717, 740 (Bankr. E.D. Pa. 2006). Stay relief, therefore, has been granted by courts when an unsecured creditor seeks to return to a non-bankruptcy forum to assert a claim which may be satisfied by a debtor's prepetition insurance coverage or when a creditor seeks to conclude prepetition litigation involving multiple parties or that is ready for trial. *In re SCO Group, Inc.,* 395 B.R. at 857; *In re Chan,* 355 B.R. at 498.

### B.  Debtor's Bad Faith as "Cause" for Relief from the Automatic Stay

The Bankruptcy Code "imposes on debtors a duty not to abuse the judicial system." *In re Merchant,* 256 B.R. at 577. A chapter 11 case filed in bad faith, therefore, is subject to dismissal under §1112(b).[19] *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661 (Bankr. E.D. Pa.

---

[18] In making this determination, courts also consider whether: only issues of state law are involved; judicial economy will be promoted; the litigation will interfere with the bankruptcy case; the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court; relief will result in a complete resolution of the issues; a specialized tribunal has the expertise to hear such cases; the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; the action primarily involves third parties; litigation in another forum would prejudice the interests of other creditors; movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under section 522(f); the non-bankruptcy proceedings have progressed to the point where the parties are prepared for trial; and the non-bankruptcy case lacks any connection with the bankruptcy case. *In re Chan,* 355 B.R. at 499. The relevance and weight of the various factors will depend upon the circumstances of the case involved. *Id.* at 500.

[19] While 11 U.S.C. § 1112(b) does not specifically list bad faith as a "cause" for dismissal, the Third Circuit has held that a lack of good faith in filing is cause for dismissal under §1112(b). *In re Mattera,* 05–39171 (DHS), 2006 WL 4452834, at *2 (Bankr. D. N.J. Feb. 6, 2006) ("It is well-settled that Chapter 11 bankruptcy petitions are subject to dismissal under §1112(b) of the Bankruptcy Code unless filed in good faith.").

2009). Facts that would justify dismissal of a bankruptcy case also generally constitute cause for

granting relief from the stay under §362(d)(1). *In re Porter,* 371 B.R. at 745 (citing several

chapter 11 cases granting secured creditors stay relief on the basis of debtors' bad faith).

Accordingly, "cause" exists to terminate the automatic stay when a chapter 11 petition has been

filed in bad faith.[20]

In addition, the determination of a debtor's bad faith in filing a case may also constitute

"cause" to grant relief from the automatic stay in favor of unsecured creditors. *Drauschak v.*

*VMP Holdings Ass'n, L.P.,* 481 B.R. 330, 345 (Bankr. E.D. Pa. 2012) (B.J. Fox) (noting that an

exception to the general principle that unsecured creditors cannot demonstrate cause for stay

relief exists when a debtor files a bankruptcy in bad faith); *In re Quad Sys. Corp.,* No. 00-

35667F, 2001 WL 1843379, at *6 (Bankr. E.D. Pa. March 20, 2001) (noting that an exception to

the general principle that unsecured creditors cannot demonstrate cause for relief from the stay

exists when a debtor has filed a bankruptcy case in bad faith) (B.J. Fox); *Mother African Union*

*Methodist Church v. Conf. of African Union First Colored Methodist Protestant Church (In re*

*Conf. of African Union First Colored Methodist Protestant Church),* 184 B.R. 207, 218 (Bankr.

D. Del. 1995) (finding that filing for bankruptcy in bad faith is cause for relief under §362(d)(1)

in the context of a stay relief motion filed by an unsecured creditor); *In re Maurice,* 167 B.R.

114, 124 n.1, 125 (Bankr. N.D. Ill. 1994) (cause existed to lift the automatic stay for unsecured

judgment creditor because the debtor had filed the case in bad faith and because the balance of

---

[20] *In re Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986) ("Numerous cases have found a lack of good faith to constitute cause for lifting the stay to permit foreclosure or for dismissing the case."); *In re Stoltzfus,* No. 09–11904bf, 2009 WL 2872860, at *3 (Bankr. E.D. Pa. March 30, 2009) (citing chapter 11 cases granting secured creditors stay relief to support the court's finding that if a petition is not filed in good faith, such may constitute cause for relief from the stay); *In re Porter,* 371 B.R. at 745; *Myers v. S. Med. Supply Co. (In re Myers),* 334 B.R. 136, 147 (Bankr. E.D. Pa. 2005) (citing to a chapter 11 case which held that filing a petition in bad faith is grounds for granting relief from the stay); *In re Merchant,* 256 B.R. at 576-77.

hardships of not granting the creditor relief to continue litigation in another forum tipped in favor of the creditor).

### C. Determining Bad Faith

In determining whether a case has been filed in bad faith, courts must examine the totality of the circumstances.[21] *In re Soppick,* 516 B.R. 733, 746 (Bankr. E.D. Pa. 2014). In fact, courts may consider any factor that evidences an intent to abuse the protections, provisions, purpose, or spirit of the Bankruptcy Code. *Id.; In re Gray,* No. 06–927, 2009 WL 2475017, at *4 (Bankr. N.D. W. Va. Aug. 11, 2009). Two of the most important factors for courts to consider include whether (1) the petition serves a valid bankruptcy purpose and (2) the petition was merely filed to obtain a tactical litigation advantage. *In re Mattera,* 05–39171 (DHS), 2006 WL 4452834, at *3 (Bankr. D. N.J. Feb. 6, 2006). While chapter 11 filings triggered by state court proceedings do not *per se* constitute bad faith filings, "where a debtor's reorganization effort involves essentially a two-party dispute which can be resolved in state court, and the evidence demonstrates that the filing for bankruptcy relief 'is intended to frustrate the legitimate efforts of creditors to enforce their rights against the debtor…'" a finding that the petition was filed in bad faith is generally warranted. *Id.*

The factors typically considered in evaluating whether a chapter 11 case was filed in bad faith include whether: (1) the debtor has few or no unsecured creditors; (2) there has been a previous bankruptcy petition by the debtor; (3) the prepetition conduct of the debtor has been improper; (4) the petition effectively allows the debtor to evade court orders; (5) there are few debts to non-moving creditors; (6) the petition was filed on the eve of foreclosure; (7) the

---

[21] The test for determining whether a bankruptcy case was filed in bad faith is the same under §362 and §1112(b). *Laguna Assocs. Ltd. Ptshp. v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship.),* 30 F.3d 734, 737-38 (6th Cir. 1994); *In re Club Tower L.P.,* 138 B.R. 307, 310 (Bankr. N.D. Ga. 1991).

foreclosed property is the sole or major asset of the debtor; (8) the debtor has no ongoing

business or employees; (9) there is no possibility of reorganization; (10) the debtor's income is

not sufficient to operate; (11) lack of pressure from non-moving creditors; (12) reorganization

essentially involves the resolution of a two-party dispute; and (13) the debtor filed solely to

create the automatic stay. *United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital*

*LLC),* 572 B.R. 582, 589 (Bankr. W.D. Pa. 2017); *In re DCNC,* 407 B.R. at 662; *Primestone Inv.*

*Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners, L.P.),* 272 B.R. 554, 557

(Bankr. D. Del. 2002).

Ultimately, petitions filed with the primary intent of obstructing creditors without a

reorganizational purpose or an ability to reorganize are filed in bad faith.[22] Good faith requires,

at the very least, a reasonable expectation on the part of the debtor that a successful

reorganization can be accomplished. *In re Merchant,* 256 B.R. at 577.

### D.  Cause Exists to Grant Relief from the Automatic Stay

In analyzing the multiple factors to determine whether the Debtor's chapter 11 case was

filed in bad faith, it becomes clear that almost all of the factors have been triggered in the

Debtor's case. In particular, the Debtor listed only two unsecured creditors in his schedules, the

Debtor filed a prior bankruptcy case, the Debtor's current bankruptcy filing allowed the Debtor

to evade the writ of execution on the Rashid Judgment and the writ of seizure in favor of

Kichkin, there are few debts to non-moving creditors in the Debtor's case, the Debtor's current

chapter 11 case was filed on the same day that Rashid filed a praecipe to enter judgment against

the Estate in order to obtain the Second Distribution, the Second Distribution is the Debtor's sole

---

[22] *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F.3d 154, 165 (3d Cir. 2009); *In re Soppick,* 516 B.R. at 747; *In re DCNC,* 407 B.R. at 661 (chapter 11 case initiated to hinder creditors is not filed in good faith); *In re Joobeen,* Nos. 06–15749DWS, 06–15752DWS, 2007 WL 1521230, at *4 (Bankr. E.D. Pa. May 23, 2007).

asset, there has been little pressure from nonmoving parties, the Debtor's chapter 11 case essentially involves the resolution of the dispute between the Debtor and the Movants and the Debtor filed this chapter 11 case solely to create the automatic stay.

In addition, the Court finds that the Debtor's prepetition conduct related to the Distribution has been improper. In the Trustee's Letter, the Trustee explicitly stated that the Distribution constituted property of the estate and that such funds were to be used to pay creditors. The Trustee also warned the Debtor that his good faith would be called into question if he spent the Distribution. In flagrant disregard of the Trustee's Letter, the Debtor spent the entire Distribution without any means of reimbursing such amount to pay his creditors. Although the Debtor initially amended his chapter 13 plan to repay the $100,000 back into his bankruptcy estate, the Debtor failed to identify a source of funds and certainly could not rely upon his business income to do so. One day later, the Debtor moved to dismiss his case. It is clear that the Debtor dismissed his chapter 13 case in order to avoid paying the Distribution to his creditors. Moreover, the Debtor's decision to file this chapter 11 case a few months after such dismissal and the Debtor's refusal to pay the $100,000 into his chapter 11 estate confirms that the Debtor never had any intention of repaying the Distribution to his creditors. The Court finds, therefore, that the Debtor's prepetition conduct has been improper and that the Debtor has acted in bad faith.

The Court also finds that there is no possibility that the Debtor can reorganize because the Debtor's income is not sufficient to operate. Based upon the Debtor's own testimony and the monthly operating reports filed in both of his bankruptcy cases, it is clear that the Debtor does not have the ability to reorganize. The Debtor openly admitted in Court that it has become increasingly difficult for him to operate his jewelry business and that the 2018 holiday season

was the worst season he has seen in 35 years. Although the Debtor testified that he is taking certain actions to make his business more profitable, there simply was insufficient evidence presented to the Court to overcome the significant business losses that the Debtor has sustained in both bankruptcies. During the Debtor's first case, he used the Distribution and the Horizon Loan to offset substantial monthly losses in every single month that he was in bankruptcy. In the absence of these funds, the Debtor's business sustained over $120,000 in losses over 5 months and had no hope of rehabilitation.

The same pattern again emerged during this chapter 11 case with Debtor's business expenditures consistently exceeding his income. The Court finds, therefore, that the Debtor has insufficient business income to operate and, as a result, there is no possibility that the Debtor can reorganize. Based upon the foregoing and given the timing of the filing of this bankruptcy, the Court concludes that the Debtor filed this chapter 11 case with the primary intent of obstructing Kichkin and Rashid without a valid reorganizational purpose or an ability to reorganize and, therefore, this case has been filed in bad faith.

Moreover, looking at the totality of the circumstances, the Court finds that the Debtor has also acted in bad faith throughout both of his bankruptcies based upon the Debtor's disturbing lack of disclosure and disregard for his duties in bankruptcy. During his chapter 13 case, the Debtor failed to disclose his interest in the Estate on his schedules and claimed at the 341 Meeting that he had no idea if the Estate was solvent, despite the fact that he had previously served as the Estate's executor. The Debtor also failed to disclose in his SOFA, and failed to inform the Trustee, that he already had received $40,000 from the Estate prior to filing for bankruptcy.

Furthermore, there were rampant inconsistencies throughout the Debtor's chapter 13 and chapter 11 filings which the Debtor has failed to explain. For instance, the Debtor listed his gross income for each of the past two years as $30,000 in his SOFA, even though that directly conflicts with all of his monthly reports which generally reflect that he generates gross income of about $10,000 per month. Second, it is unclear how the Debtor covered his business losses in March and April of 2018. Similarly, the Debtor has sustained significant losses during this Chapter 11 case but has provided no explanation. Moreover, there are numerous, serious mathematical mistakes in his monthly reports which attempt to hide these losses while directly contradicting the activity reflected in his bank statements. The Debtor also failed to list the Horizon Loan, as well as the $7,000 that he allegedly borrowed from a cutting customer to pay for the chapter 11 case, on his chapter 11 schedules. These inconsistencies further confirm the Court's conclusion that the Debtor filed this case in bad faith.

Cause, therefore, exists to grant relief from the automatic stay to allow: Rashid to pursue his state law rights against the Second Distribution; Kichkin to pursue its state law rights against the Gems;[23] and the Movants to resume, and liquidate, their claims against the Debtor in the

---

[23]     In addition to the Debtor's bad faith, relief from the stay is also warranted in favor of Kichkin under §362(d)(1) because the Debtor has a mere possessory interest in the Gems, has not demonstrated a need to retain possession and has not adequately protected Kichkin's interest in the Gems. By way of background, the Debtor has repeatedly admitted, and the Partnership Agreement clearly reflects, that, as of commencement of the bankruptcy case, Kichkin maintained title to the Gems. Ex. D-1 at 1, 3; Jan. 9 Tr. 101:18-25, 102:17-25, 111:24 – 112:9, 112:18 – 113:19. The Debtor, therefore, does not own the Gems, but has, rather, a mere possessory interest in them. *See In re Moore & White Co.*, 83 B.R. 277, 280-81 (Bankr. E.D. Pa. 1988) (B.J. Fox). While a mere possessory interest in personal property is sufficient to trigger protection of the automatic stay, where the Debtor has no right of ownership or contractual right to possession, relief from the automatic stay is readily granted for cause pursuant to §362(d)(1) unless the Debtor demonstrates some need to retain possession and offers to adequately protect the owner's interest in the property. *Id.* at 281. If bankruptcy serves no legitimate purpose in retaining the debtor's possession, the property owner should be granted relief from the stay to exercise its non-bankruptcy law rights to recover possession from the Debtor. *In re Dunlop*, 378 B.R. 85, 92 (Bankr. E.D. Pa. 2007).

Here, the Debtor admitted that he could not sell the Gems and wanted to return them, therefore, he clearly has no need to retain their possession and retaining their possession would serve no purpose in this bankruptcy case. Jan. 9 Tr. 77:23 – 78:2; Jan. 29 Tr. 21:20 – 24:1. Additionally, the Gems are not adequately protected because the insurance company refused to insure them. Jan. 29 Tr. 19:1-25. Therefore, cause exists to grant Kichkin relief from the automatic stay to pursue its state law remedies to recover possession of the Gems.

State Court, but not to execute on any judgment entered in State Court without further relief from this Court.

In addition to the Debtor's bad faith, relief from the stay is also warranted in favor of the Movants because allowing the State Court Action to resume does not cause great prejudice to either the Debtor or the estate and the hardship to the Movants caused by the continuance of the stay outweighs the hardship to the Debtor caused by the stay.[24] Here, the Debtor will not be prejudiced by allowing the State Court Action to proceed, because the Movants will not be permitted to execute on any judgment that they may obtain without further leave of this Court. *See In re Chan*, 355 B.R. at 501 (noting that when judicial economy may support the return of litigation to a non-bankruptcy forum, the bankruptcy court may exercise its discretion to grant relief while imposing conditions to prevent prejudice to the estate).

In addition, although the Court can infer that defending against the remaining claims in the State Court Action would impact the Debtor and the estate, these claims would have to be litigated, whether in this Court or State Court. *See In re Quad Sys. Corp.,* 2001 WL 1843379, at *7 (finding stay relief may be necessary when there is administrative need to fix the claim). This Court is not in a position to conclude that the difference in cost of doing so in State Court versus this Court would be significant. *See O'Neal Steel, Inc. v. Chatkin (In re Chatkin),* 465 B.R. 54, 64 (Bankr. W.D. Pa. 2012). In fact, litigating in the bankruptcy forum which has no familiarity with the underlying substantive claims would likely be more burdensome to the Debtor and the estate than concluding litigation in State Court where it seems to have advanced to near

---

[24] The stay also may be lifted when there is an administrative need in the bankruptcy case to fix the amount of the claim and the dispute has been pending for considerable time in a non-bankruptcy forum. *In re Quad Sys. Corp.,* 2001 WL 1843379, at *7. Here, the Movants' voting rights under any proposed chapter 11 plan, the ability of the unsecured creditor class to approve or reject a proposed plan, and their distribution rights will be determined in part by the amount of their claims, making it necessary to liquidate them. *See* 11 U.S.C. § 1126(c).

completion.[25] *See In re Glunk*, 342 B.R. at 742 (granting unsecured creditors' motion to modify stay in part due to state court's familiarity with four-year old proceeding).

In addition, the legislative history of §362(d)(1) emphasizes the importance of allowing a case to continue in the original tribunal so long as there is no great prejudice to the estate. *In re SCO Group, Inc.*, 395 B.R. at 856. The Court is confident that by exercising its discretion to allow the Movants to liquidate their claims in State Court while ordering them to refrain from executing on any judgments without further relief from this Court,[26] prejudice to the estate and other creditors will be minimized.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants relief from the automatic stay to the Movants to permit (1) Rashid to pursue his state law rights against the Second Distribution; (2) Kichkin to pursue its state law rights against the Gems; and (3) both Movants to resume the State Court

---

[25] The State Court record reflects that the action has been pending for a substantial period – almost three years. *See In re Chan*, 355 B.R. at 501 (noting that it may be appropriate for proceedings to continue in non-bankruptcy forum where they have been pending for a substantial period and are close to trial). Considering that the State Court has already disposed of a motion for summary judgment, the remaining claims appear on the verge of trial. *See id.* Litigating in this forum for almost three years has undoubtedly allowed the State Court to become intimately familiar with the underlying facts, making it far more efficient to allow the claims to be litigated there in the interest of judicial economy. *See In re Glunk*, 342 B.R. at 741-42.

[26] *See Matter of Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982) (affirming order allowing unsecured creditor to continue state court litigation in part because the order prohibited unsecured creditor from enforcing judgment); *Thors v. Allen*, Civ. Nos. 16-2224 (RMB), 16-2225 (RMB), 2016 WL 7326076, at *5, 8 (D. N.J. Dec. 16, 2016) (affirming order granting relief for creditor to continue action in state court to determine parties' rights to a lease but preventing creditor from taking any action to enforce state court order without further relief from bankruptcy court); *In re Boltz-Rubenstein*, Civ. No. 10-7099, 2011 WL 13196622, at *2 n.1 (E.D. Pa. Feb. 24, 2011) (affirming order modifying the automatic stay to permit unsecured creditor to continue prosecution of district court action so long as no execution against Debtor issued on any money judgment absent further relief from bankruptcy court); *In re Pro Football Weekly, Inc.*, 60 B.R. 824, 827 (N.D. Ill. 1986) (granted stay relief to unsecured creditor to prosecute counterclaim in state court but not collect on any judgment); *O'Neal Steel*, 465 B.R. at 61 (granting stay relief to unsecured creditors to continue district court litigation where they agreed they would not attempt to enforce a judgment); *In re Glunk*, 355 B.R. at 501 (noting bankruptcy court may permit non-bankruptcy action to proceed but restrain execution on any judgment); *In re Glunk*, 342 B.R. at 728, 739 (stay relief granted where unsecured creditors only sought to proceed to state court trial to determine liability and not to collect any assets of the debtor unless further authorized by bankruptcy court); *In re Borbidge*, 81 B.R. 332, 335 (Bankr. E.D. Pa. 1988) (noting the easiest ground to determine cause exists in favor of an unsecured creditor is when the creditor only seeks to recover from non-estate property); *In re Stranahan Gear Co., Inc.*, 67 B.R. 834, 837 (Bankr. E.D. Pa. 1986) (noting that in most cases in which unsecured creditors have been granted relief the creditor does not seek to pursue assets of the estate or is prohibited from doing so).

Action on their remaining claims against the Debtor, but not to further execute on any judgments

entered against the Debtor in State Court without further relief from this Court.

Date: March 28, 2019

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge